Robert J. McDONALD, Plaintiff,

v.

**RAYTHEON AIRCRAFT CORPORATION,**
Defendant.

**Civil Action No. 95–1398–MLB.**

United States District Court,
D. Kansas.

April 3, 1997.

J. Patrick Walters, Wichita, KS, for Robert J. McDonald.

Terry L. Mann, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, KS, for Raytheon Aircraft Corp.

### MEMORANDUM AND ORDER

BELOT, District Judge.

Before the court are the following:

(1) Defendant Raytheon Aircraft Corporation's ("Raytheon") motion to dismiss or for partial summary judgment (Docs.8);

(3) Plaintiff Robert J. McDonald's ("McDonald") response (Doc. 12);

(4) Raytheon's reply (Doc. 32);

(5) Raytheon's motion for summary judgment (Doc. 49);

(6) McDonald's response (Doc. 56);

(7) Raytheon's reply (Doc. 61).

## UNDISPUTED FACTS

The following facts are undisputed by the parties, unless otherwise noted.[1] McDonald was employed as a sheet metal assembler at Raytheon from October 26, 1988 until he was terminated on June 14, 1994 (Doc. 49 at 3). As a sheet metal assembler, McDonald was required to do a substantial amount of standing and walking and to lift a seventy-five pound nosebud assembly approximately six times per day (Doc. 56 at 5).

McDonald had no written employment contract with Raytheon (Doc. 49 at 4; Doc. 56 at

2). Raytheon's general policy regarding absences provided a three-step disciplinary process culminating in termination ("Policy No. 32–3001").[2]

During McDonald's employment, he was a member of the International Association of Aerospace Workers ("IAM"), and as such, he was subject to a collective bargaining agreement at the time of his termination (Doc. 49 at 4). The collective bargaining agreement provided that Raytheon could terminate any employee absent for three days' duration without a valid excuse.[3]

Sometime during his employment at Raytheon, McDonald was diagnosed with having an ulcer and his crew chief, Darlene Kaiser, became aware that McDonald was being treated for ulcers and a spastic colon (Doc. 56 at 7–8). Nearly a year before McDonald was terminated (July 23, 1993), Raytheon's medical department and workers compensa-

---

**1.** Most of McDonald's responses to Raytheon's statement of uncontroverted facts are nonresponsive because they offer additional facts and/or legal arguments and conclusions. *See e.g.,* Doc. 56 at 1–4, ¶¶ 5, 15, 16, 18, 21, 23, 24, 25 and 28. These responses are improper and the court will deem Raytheon's corresponding facts as uncontroverted. *See* D. Kan. Rule 56.1.

**2.** Raytheon's Policy No. 32–3001 provided that "written disciplinary action will be taken as follows and recorded in the absence/attendance system as 'Step 1 Action.'
*Step 1 Action—Written Warning*
1. Absences of five days or more in the four-month evaluation period.
2. Number of different periods of absence totals four or more in the four-month period.
3. Absence extending one through five working days for a reason which is considered unsatisfactory.
4. Partial absence (tardy, out early, or absent during work day) five times in the four-month period or three partial day absences any month.
5. Any combination of partial and full day absences totalling five (5) in a four-month period. Written warning, using Form 69–32148, will include a summary review of the employee's attendance record and warning that he is jeopardizing his employment because of unsatisfactory attendance.
. . .
*Step 2 Action—Suspension Notice*
After action in Step 1, if the employee's attendance continues to be unsatisfactory, issue a second warning or suspend him for a period of one to five consecutive days *depending upon an evaluation of the attendance record and the judgment of the supervisor.* Warn the employee that if his attendance continues to be unsatisfactory, he

may be terminated. Form 69–32148 should be used for this action and recorded in the absence attendance system as 'Step 2 Action.'
. . .
*Step 3 Action—Termination*
After action in Steps 1 and 2, if the employee's attendance continues to be unsatisfactory, the employee should be terminated.
. . .
C. Termination of an employee may happen without following Steps 1, 2, and 3 above.
1. If an employee is absent three (3) consecutive days without notifying the company.
2. Absence of more than five (5) consecutive work days for reasons which are considered unsatisfactory after the initial written warning was issued, as outlined in Step 1."
(Doc. 56, Ex. C at 3–4) (Emphasis in original).

**3.** The collective bargaining agreement provided:

It is mutually agreed that the Company has and will retain the unquestionable and exclusive rights and power to manage the plant and direct the working forces, including, and not limited to, the right to hire, classify, grade suspend, discharge, promote, demote or transfer its employees, provided it does not conflict with the provisions of this Agreement.

\* \* \* \* \* \*

Employees shall not lay off without first obtaining permission from the foreman to do so, except in case of emergency, sickness or other cause beyond the control of the employee, of which the foreman shall be promptly advised. Any absence of three (3) days' duration or greater without notification, permission or valid excuse, shall cause the employee to be terminated.
(Doc. 49 at 4).

tion manager, Ray Lagpacan, prepared and filed a "Form 88" [4] with the state of Kansas stating that McDonald suffered from a spastic colon (Doc. 56 at 11). Three or four months before he was terminated, he told his foreman, Gary Pickett, that he had some health problems, including an ulcer (Doc. 56 at 7–8).

Although McDonald's performance reviews indicated that the quantity, quality and accuracy of his work was satisfactory or above (Doc. 56 at 6), his attendance problems began shortly after he finished his initial probationary period as an employee. He was absent or counseled about his attendance repeatedly between 1989 and October 20, 1993.[5]

On October 20, 1993, Pickett placed McDonald on "absence verification status", meaning if he was absent for any medical reason, he would have to provide a diagnosis from a medical professional and a note stating he was unable to attend work and perform his job assignment (Doc. 49 at 6).[6] Pickett often placed an employee on absence verification status if he had a substandard history of attendance, in many cases if the employee was on a Step Two violation under Policy No. 32–3001. He placed McDonald on the status because of his "history of absenteeism". (Doc. 56 at 8).

McDonald was absent on December 6, 1993. He reported for work on December 7, and submitted a note from his doctor stating "Please excuse due to illness." McDonald was told that the excuse was unacceptable because it did not provide a diagnosis or state that he was unable to attend work, and that no sick leave would be granted until he brought in an acceptable note from his doctor. McDonald told his supervisors that the nature of his illness wasn't any of their business and sick leave was denied. (Doc. 49 at 6–7).

McDonald was absent again on January 17, 1994, failed to provide the requisite information from his doctor, and sick leave was denied. On March 1, he was counseled about attendance. He was absent on March 14 and 15 and provided a note from his chiropractor stating that he was receiving treatment for muscle spasms and needed to be off work to avoid aggravating his condition. As a result, sick leave was approved. McDonald was absent April 25 through 28, provided information from his chiropractor stating that he was receiving treatment for a back problem and needed to be off work to avoid aggravating his condition. As a result, sick leave was approved. (Doc. 49 at 7).

4. According to Lagpacan, a Form 88 was filed anytime an employee had a physical impairment, disorder or disease and serves the purpose of establishing a right of recovery against the second injury fund established by the Kansas Workers Compensation Act (Doc. 61 at 7).

5. McDonald's attendance records reflected the following:
*1989*
July 12–counseled; Sept. 19–written reprimand.
*1990*
Absent thirteen days, seven of which were covered by sick leave; no disciplinary actions taken.
*1991*
Jan./Feb.–absent four days; Feb. 25–counseled; March 20–absent; May 1–absent; May 3–counseled; June 13, 14–absent; Aug. 28–absent; Sept. 10–absent; Oct. 16–absent; Nov. 1, 4–absent; Nov. 5–absent for illness; Nov. 13, 14–absent; Dec. 4, 5, 6–absent.
*1992*
Jan. 8–absent (illness); Jan. 13–counseled; Jan. 31–absent; Feb. 19, 20, 21–absent; March 11–absent; March 12–Step One reprimand; May 4–absent; May 13–absent part of day; June 8–absent (personal business); June 9–counseled; July 20–absent (personal business); July 27, 28–

absent (illness); Sept. 28–absent; Oct. 26, 27, 28–absent; Nov. 16–absent; Dec. 23–absent part of day.
*1993*
Jan. 4–absent; Jan. 26–counseled; Feb. 10–absent; March 8–absent; March 22–absent part of day; April 1–counseled; May 3, 4, 5, 26, 27–absent; July 1–absent; July 2–counseled; July 14–absent part of day; July 15, 16, 19, 20, 21, 22, 23–absent; Sept. 21–absent; Oct. 4, 5, 6, 7–absent; Oct. 8–Step One reprimand.
(Doc. 49 at 5–6; Doc. 56 at 2).

6. The absence verification memo states:

"From this date forward, Mr. McDonald will provide verification for any absence. If an absence is for medical reasons the verification is to include a diagnosis of the illness by a medical professional, and a statement from the medical professional that Mr. McDonald was unable to attend work and unable to perform his job assignment. This memo serves as notification to Mr. McDonald, and Mr. McDonald is not to expect his foreman or secretary to remind him of this requirement." The memo then lists those in attendance at the time of the notification and is signed by Pickett. (Doc. 49, Ex. G).

McDonald was absent on Friday, June 3, and Monday and Tuesday, June 6 and 7, 1994. He contacted Raytheon on each of these days to notify them he would be absent (Doc. 56 at 13). When he returned on June 8, he provided a note from his doctor stating "Please excuse due to illness" and showed Pickett a signed, unfilled prescription for Axid. Pickett told McDonald this was unacceptable and reminded him of the requirements of the absence verification status. Pickett asked McDonald why, if he had been so ill, he had waited until June 7 to see his doctor. McDonald responded that this is when he had run out of medication.[7] Pickett then asked for a receipt showing the prescription had been filled or for the medication bottle itself. McDonald provided neither [8], instead bringing in a paper sack containing sample packets of expired medication. (Doc. 49 at 7–9).

On June 10, 1994, Pickett asked McDonald to sign an authorization for release of his medical records or case notes.[9] Pickett also warned McDonald that a failure to do so could result in disciplinary action, including suspension or termination. McDonald refused to sign the authorization. On June 14, 1994, Pickett again asked McDonald to sign an authorization and told him that the medical records could be sent directly to Raytheon's company doctor. Pickett again warned that failure to do so could result in suspension or termination. McDonald again refused, and was terminated on June 14, 1994. The termination form stated that he was being terminated for a violation of the attendance provisions of the collective bargaining agreement (Doc. 49 at 9 and Ex. B).

On June 16, 1994, McDonald filed a grievance alleging that he had been unjustly terminated. On June 20, during the first step of the grievance procedure, McDonald signed an authorization for release of medical records limited to June 3, 6, and 7 directly to Raytheon's company doctor. On June. 21, McDonald instructed his doctor not to release the records and instead write a letter regarding his absence. The same day, his doctor sent a letter to Raytheon's medical department stating that McDonald had a duodenal ulcer with a severe reflux and heartburn problem. The letter did not state that McDonald was unable to work or perform his job assignments on June 3, 6 and 7. (Doc. 49 at 9–10).

On December 23, 1994, after the grievance procedure had proceeded through the third step, the union notified McDonald that "[a]fter a thorough investigation into the facts that surround this case, the Union finds that there is insufficient merit to continue to the next step of the grievance procedure." (Doc. 49 at 11).

On February 23, 1994, McDonald filed a charge of disability discrimination with the Kansas Human Rights Commission ("KHRC") and the Equal Opportunity Commission ("EEOC"). The administrative complaint alleged "I have a disability which leaves me bedridden at times and causes internal bleeding" and does not allege any discrimination prior to June 8, 1994. (Doc. 49 at 12).

## DISCUSSION

McDonald claims that Raytheon breached an implied employment contract with him (Doc. 1, Count IV) and discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (Doc. 1, Count I).[10]

---

7. McDonald asserts that he contacted his physician on June 6 and that the earliest appointment he could get was on June 7, but does not state whether he told Pickett this (Doc. 56 at 3, ¶ 17).

8. McDonald did not actually have the prescription filled until June 21, 1994.

9. The parties dispute whether Pickett asked only for medical records pertaining to June 3, 6, 7, or McDonald's entire medical file (Doc. 49 at 9, ¶ 19; Doc. 56 at 3, ¶ 19). Given the court's disposition in **III. B.**, *infra*, the court finds that this dispute is not material. *See* n. 15, *infra*.

10. In addition, McDonald's complaint claimed that Raytheon violated the Kansas Act Against Discrimination, K.S.A. § 44–1001 et seq. (Doc. 1, Count II), asserted a cause of action for mental distress (*Id.*, Count III), and claimed that Raytheon breached an express employment contract with him (*Id.*, Count V).

Raytheon filed a motion to dismiss these counts and/or grant summary judgment upon them (Doc. 8). In the conclusion of McDonald's response, he withdrew "Counts II, III and IV" of his complaint (Doc. 12 at 8). McDonald apparently made a mistake in designating Count IV because he opposed summary judgment on his

## I. Summary Judgment Standards

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses". *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original).

Once the moving party properly supports its motion, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.; Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 726 (10th Cir.1991). "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988), *aff'd* 939 F.2d 901 (10th Cir.1991). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D.Kan. Rule 56.1. The court reviews the evidence in a light most favorable to the nonmoving party, *see e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## II. Implied in Fact Employment Contract Claim

McDonald's complaint claims that Raytheon's general policy governing absences, Policy No. 32–3001, *see* n. 2, *supra,* constitutes a promise by Raytheon that employees will be discharged only for good cause, and only in accordance with the discharge procedures set forth in Policy No. 32–3001 (Doc. 1 at 6).

Raytheon contends in its partial motion for summary judgment that no implied employment contract existed, and even if one did exist, Raytheon did not breach it (Doc. 8 at 8–9). Further, Raytheon argues that if McDonald is basing his claim on breach of the collective bargaining agreement, then it is preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C.

breach of implied contract claim, but did not oppose summary judgment on his breach of an express contract claim (Count V).

The court finds that Counts II, III and V have been abandoned and are dismissed.

§ 185, and is barred for several reasons (Doc. 8 at 10).

McDonald responds that summary judgment is rarely appropriate in implied employment contract cases, that the existence of such a contract is a question of fact for the jury, and therefore, summary judgment should be denied (Doc. 12 at 6–8). McDonald does not mention the collective bargaining agreement, nor does he respond to Raytheon's LMRA preemption argument. Pursuant to D. Kan. Rule 7.4, summary judgment could be granted on the preemption argument. However, inexplicably buried within McDonald's later response to Raytheon's motion for summary judgment on the ADA claim is a two paragraph argument that his state law claims are not preempted by the LMRA (Doc. 56 at 23). McDonald argues that he was terminated for violating the absence verification status, which is not expressly a part of the collective bargaining agreement. He then conclusorily states that employees are not subject to termination under the collective bargaining agreement.[11] (*Id.*). He cites no legal authority for this incomplete argument.

Raytheon's reply argues that regardless of whether McDonald's implied contract claim is based on the collective bargaining agreement, it is preempted by the LMRA, because it cannot be decided without interpreting the collective bargaining agreement (Doc. 32 at 15–17; Doc. 61 at 15–16).

Section 301 of the [LMRA] (29 U.S.C. § 185(a)), preempts state causes of action addressing "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, ... whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." When resolution of a state law claim depends upon analysis of the terms of a labor agreement, section 301 will preempt that claim.

*Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1121 (10th Cir.1995) (quoting *Saunders v. Amoco Pipeline Co.*, 927 F.2d 1154, 1155 (10th Cir.), *cert. denied*, 502 U.S. 894, 112 S.Ct. 264, 116 L.Ed.2d 217 (1991)). Any state law claim that is "substantially dependant upon" or "inextricably intertwined with" analysis of the terms of a collective bargaining agreement is preempted by section 301 of the LMRA. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220, 105 S.Ct. 1904, 1912, 1916, 85 L.Ed.2d 206 (1985).

■ Here, it is clear that McDonald's implied employment contract claim is substantially dependant upon and inextricably intertwined with an analysis of the collective bargaining agreement. McDonald admits he was a member of the IAM union and was subject to the terms of the collective bargaining agreement in effect at the time of his termination (Doc. 49 at 4; Doc. 56 at 1–2). The collective bargaining agreement permits termination of bargaining unit employees, *see* n. 3, *supra*, and Raytheon contends that McDonald was terminated pursuant to the agreement. While McDonald would have the court don blinders and view Policy No. 32–3001 and/or the absence verification status in a vacuum, the court will not do so, nor has McDonald submitted any authority suggesting that the court could do so. Thus, McDonald's implied employment contract claim is preempted by and is transformed into a claim under section 301 of the LMRA.[12] That claim fails for two reasons.

■ First, to preserve a claim under section 301, a plaintiff must file suit within six months of the date upon which his cause of action accrued. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 170–72, 103 S.Ct. 2281, 2293–94, 76 L.Ed.2d 476 (1983). McDonald's cause of action accrued on December 23, 1994, the day the union informed McDonald that it found insufficient merit in his grievance to refer it for arbitration (Doc. 49, Ex. L). *See Edwards v. Inter-*

---

**11.** McDonald cites the deposition testimony of Mr. Joseph Booth (Doc. 56, Ex. F at 22) and Mr. Jesse Thomas (*Id.*, Ex. G at 23–24), both current employees of Raytheon and former union stewards. The cited testimony does not support McDonald's argument that an employee is not subject to termination under the collective

bargaining agreement; in fact, it suggests the opposite.

**12.** For this reason, the court need not discuss whether Policy No. 32–3001, in and of itself, constituted an implied contract of employment under Kansas law.

*national Union, UPGWA,* 46 F.3d 1047, 1053–54 (10th Cir.) (discussing accrual under the LMRA), *cert. denied,* —— U.S. ——, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995). McDonald filed this action on September 20, 1995 (Doc. 1). Thus, McDonald's filed his claim outside the statute of limitations and it is time-barred.

 Second, in an action against an employer under section 301, a plaintiff must first show that his union failed to fulfill its duty of fair representation. *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir. 1992). To do this, a plaintiff must show the union's actions were arbitrary, discriminatory or in bad faith. *Id.* McDonald has not made any allegations against the IAM, nor is there anything before the court suggesting that the IAM failed to fulfill its duty. Thus, McDonald cannot establish this threshold showing and his claim under section 301 must fail.

For the foregoing reasons, the court finds that Raytheon's motion for summary judgment on the implied contract claim should be granted.

### III. ADA Claim

McDonald also contends that Raytheon discriminated against him in violation of the ADA, 42 U.S.C. § 12101 *et seq.* (Doc. 1, Count I).

The ADA prohibits a "covered entity" from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to ... discharge ... and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, a plaintiff must show

> (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability.

*MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1443 (10th Cir.1996).

### A. "Disabled Person"

McDonald argues that his physician's diagnosis of a spastic colon, duodenal ulcer and reflux of the esophagus renders him a disabled person under the ADA (Doc. 56 at 19). Raytheon argues that McDonald is not a disabled person (Doc. 49 at 14–21). Although the court has grave doubts that McDonald is disabled under the definition set forth in the ADA, it need not discuss this issue, because it finds, *infra,* that McDonald fails the second element of a prima facie case.

### B. "Otherwise Qualified"

 Raytheon argues that McDonald is not "otherwise qualified" to perform the essential functions of his job as a result of his excessive absences and refusal to comply with the absence verification status. Raytheon cites a myriad of cases from other jurisdictions holding that attendance is an essential function of a job, and therefore, a plaintiff that is excessively absent is not an "otherwise qualified" individual. (Doc. 49 at 21–23).

McDonald responds that the quality, quantity and accuracy of his work was satisfactory or above average according to his performance reviews, and while his history of absences was "not insubstantial" it did not compare "to the weeks and months" missed by the employees in the cases cited by Raytheon. McDonald also argues that Raytheon presented no evidence that McDonald's absences resulted in business not being completed in a timely and efficient manner. He cites one case from another jurisdiction, *Carlson v. InaCom Corp.,* 885 F.Supp. 1314 (D.Neb.1995), for the proposition that there is no legal authority establishing requisite attendance levels for a particular job; rather, it depends on the circumstances of each position. (Doc. 56 at 21).

Raytheon replies that it did present evidence that the annual cost to Raytheon for employee absenteeism is approximately twenty million dollars and that McDonald admitted that when he was absent, his work either didn't get done or had to be completed by one of his co-workers. Raytheon distinguishes the *Carlson* case by noting that the defendant employer had no policy on unscheduled absenteeism, and had never before terminated an employee for excessive absenteeism. (Doc. 61 at 14).

To satisfy the second element of a prima facie case, a plaintiff must show that he is a "qualified individual", *i.e.*, that with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job. *MacDonald*, 94 F.3d at 1443. The Tenth Circuit employs a two-part analysis for determining whether an individual is qualified:

First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir.1996) (quoting *White v. York Int'l Corp.*, 45 F.3d 357, 361–62 (10th Cir.1995)); *see also Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995).

McDonald has failed to meet his burden of showing that he could perform the essential functions of his job. It is clear that showing up at work bears "more than a marginal relationship", *id.*, to the job of sheet metal assembler. In *Tyndall v. National Educ. Centers*, 31 F.3d 209 (4th Cir.1994), one of the cases cited by Raytheon supporting its position, the Fourth Circuit affirmed the trial court's grant of summary judgment against a plaintiff asserting an ADA claim:

[Plaintiff] contends that she was qualified for her job because she could perform all of her teaching duties and received "excellent" and "good" performance evaluations at [defendant's school]. We agree, and [defendant] does not dispute, that the quality of [plaintiff's] performance when she was working was more than adequate. However, an evaluation of the quality of [plaintiff's] performance does not end our inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effec-

tively perform all work-related duties at home, an employee "who does not come to work cannot perform any of his job functions, essential or otherwise." *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn. 1986), *aff'd*, 831 F.2d 298 (6th Cir.1987). Therefore, a regular and reliable level of attendance is a necessary element of most jobs. *See, e.g., Carr v. Reno*, 23 F.3d 525, 529 (D.C.Cir.1994) (holding that "coming to work regularly" is an "essential function"); *Law v. United States Postal Serv.*, 852 F.2d 1278, 1279–80 (Fed.Cir.1988) (holding that attendance is a minimum function of any job); *Walders v. Garrett*, 765 F.Supp. 303, 309 (E.D.Va.1991) (holding that "reasonably regular and predictable attendance is necessary for many [jobs]"), *aff'd*, 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple Univ.*, 739 F.Supp. 974, 979 (E.D.Pa. 1990) ("attendance is necessarily the fundamental prerequisite to job qualification"), *aff'd*, 928 F.2d 396 (3d Cir.1991). An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual protected by the ADA. *See Carr*, 23 F.3d at 529–30; *Walders*, 765 F.Supp. at 314; *Santiago*, 739 F.Supp. at 979.

*Id.* at 213.

While the court could not locate any published Tenth Circuit authority on this issue, one unpublished decision provides persuasive support. *See* 10th Cir. R. 36.3. In *Wilson v. State Insurance Fund*, No. 96–6100, 1997 WL 12929, at **2 (10th Cir. Jan.15, 1997), copy attached, the Tenth Circuit affirmed the trial court's grant of summary judgment against a plaintiff who was excessively absent, holding that he was not a qualified individual under the ADA.[13]

McDonald's vague, conclusory protest that "the number of unscheduled absences in no way compares to the weeks and months missed by employee's in the cases cited by defendant" (Doc. 56 at 21) misses the point. The requisite attendance level depends on the job at issue. There is no evidence that McDonald could have performed his sheet metal assembly work at home. The requisite attendance level for a sheet metal assembler

---

**13.** It appears that the trial court also relied on the Fourth Circuit decision in *Tyndall*. *See id.*

is defined, at least in part, by the collective bargaining agreement. *See* n. 3, *supra; Milton,* 53 F.3d at 1124 (terms of a collective bargaining agreement are relevant to determining whether a job requisite is essential (citing 29 C.F.R. Pt. 1630, App. § 1630.2(n))); *cf. Carlson,* 885 F.Supp. at 1321 & n. 11 (noting that defendant had no policy on unscheduled absenteeism and had never before fired an employee for absenteeism). Moreover, it is not as if McDonald was blindsided regarding his attendance problems. He was counseled repeatedly about his absences. *See* n. 5, *supra.*

Because the court has found that McDonald could not perform the essential functions of his job, it must determine whether any reasonable accommodation by the employer would enable him to perform those functions. *See Lowe,* 87 F.3d at 1174, 42 U.S.C. § 12112(b)(5)(A).

> Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate.

*Milton,* 53 F.3d at 1124 (quoting *White,* 45 F.3d at 361).

Here, McDonald has not even mentioned the issue of accommodation, much less presented any evidence of an accommodation that Raytheon could have made for his excessive absences.[14] *Cf. Hudson v. MCI Telecommunications Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996) (plaintiff argued defendants failed to reasonably accommodate her by refusing to provide unpaid leave while she sought treatment); *Milton,* 53 F.3d at 1124–25 (rejecting several accommodations suggested by plaintiffs). Because McDonald has produced no evidence that accommodation was possible, the court finds that he is not a qualified individual, and therefore, Raytheon is entitled to summary judgment on McDonald's ADA claim.[15]

### CONCLUSION

Raytheon's motions for summary judgment (Docs.8, 49) are GRANTED. The matter is dismissed and all relief is denied.

A motion or motions for reconsideration of this order shall comply with the provisions of this court's Rule 7.3 and *Comeau v. Rupp,* 810 F.Supp. 1172, 1174 (D.Kan.1992). The motion shall be limited to 5 pages in 10 cpi type for both main and footnote text. Only footnotes may be single-spaced. A response shall be limited to 5 pages. No reply shall be filed.

IT IS SO ORDERED.

### ATTACHMENT

106 F.3d 414 (Table)

9 NDLR P 98,97 CJ C.A.R. 125

Unpublished Disposition

(Cite as: 106 F.3d 414, 1997 WL 12929 (10th Cir.(Okla.)))

NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, sus-

---

14. Although the parties have not raised it, the absence verification status McDonald now complains about could be viewed as an attempt by Raytheon to accommodate his disability.

15. Given the court's finding that McDonald was not a qualified individual under the ADA, it is unnecessary to discuss the third element of a prima facie case, *i.e.,* that Raytheon terminated him solely because of his disability. *See White,* 45 F.3d at 363. Nor does it need to reach the issue of whether Raytheon has offered a legitimate nondiscriminatory reason for terminating McDonald. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1322–24 (10th Cir.1997) (discussing application of *McDonnell Douglas* burden shifting analysis after plaintiff has put forward a prima facie case under the ADA).

Finally, given the court's finding that McDonald was not a qualified individual under the ADA, it is also unnecessary to discuss McDonald's claim that Raytheon's absence verification status constituted discrimination under the ADA (Doc. 56 at 24). *See* 42 U.S.C. § 12112(d)(1), (d)(4)(A); *see generally, Yin v. State of California,* 95 F.3d 864, 867–69 (9th Cir.1996) (holding that employer may compel an employee with excessive absences to undergo a fitness-for-duty medical examination under the business necessity exception), *cert. denied,* —— U.S. ——, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997).

pending 10th Cir. Rule 36.3 until December 31, 1995, or further order.

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)

Frederick Randall WILSON,
Plaintiff–Appellant,

v.

STATE INSURANCE FUND, ex rel. STATE OF OKLAHOMA,
Defendant–Appellee.

No. 96–6100.

United States Court of Appeals,
Tenth Circuit.

Jan. 15, 1997.

ORDER AND JUDGMENT [FN *]

FN * This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before EBEL and HENRY, Circuit Judges, and DOWNES, [FN **] District Judge.

FN ** Honorable William F. Downes, District Judge, United States District Court for the District of Wyoming, sitting by designation.

** 1 After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed.R.App.P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiff Frederick Randall Wilson appeals from the district court's order disposing of his claims of employment discrimination against defendant State Insurance Fund (SIF). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

In February 1990, SIF hired plaintiff, a person functioning within the mild range of mental retardation, as a light vehicle driver under a program for prospective state agency employees with severe disabilities. See Okla. Stat. tit. 74, § 840–4.12(H). Throughout his employment, plaintiff had a history of absenteeism and noncompliance with attendance procedures. These attendance problems worsened after he suffered an on-the-job injury on January 29, 1993. His treating physician released him for light-duty work on February 22, and for work without restrictions on March 18. However, plaintiff worked only 4.5 hours during the month of March. He brought physicians' slips to SIF showing that he was under medical care on March 15 and March 25–30.

On April 2, plaintiff's supervisors counseled him on his attendance problems and ordered him to return to work. Nevertheless, plaintiff missed eleven of the fifteen working days between April 1 and April 21. He provided documentation of medical treatment on April 8–9 and April 15–16. On April 21, the director of human resources questioned plaintiff about his recent absences and told him to return to work immediately or face dismissal. After talking to his father on the telephone, plaintiff asked for additional time off to see his vocational rehabilitation counselor. The director denied the request and plaintiff wrote a letter stating that he was resigning "under duress." Appellant's App. at 22.

Plaintiff exhausted his administrative remedies and brought this action, alleging that he had been constructively discharged in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213; the Oklahoma Antidiscrimination Act, Okla.Stat. tit. 25, §§ 1301–11, 1901; the "persons with severe disabilities" provisions of the Oklahoma Personnel Act, Okla.Stat. tit. 74, § 840–4.12(H); and Oklahoma public policy. [FN1] The gist of plaintiff's complaint was that SIF failed to accommodate his mental handicap because it did not recognize that his absenteeism was in reaction to unsatisfactory work conditions. The trial court entered summary judgment in SIF's favor on the ADA and public policy claims and dismissed the state statutory claims. This appeal followed.

FN 1. Plaintiff also alleged a violation of the federal Rehabilitation Act, 29 U.S.C. § 794. Plaintiff has not appealed the trial

court's ruling that SIF is not subject to the Act because it did not receive federal financial assistance.

We review a district court's grant of summary judgment de novo, applying the same standards as the district court under Fed. R.Civ.P. 56(c). *Wolf v. Prudential Ins. Co.*, 50 F.3d 793, 796 (10th Cir.1995). Pursuant to Rule 56(c), summary judgment shall enter when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

**2 To establish a prima facie case of a wrongful discharge under the ADA, a plaintiff must show that: (1) he is a disabled person within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job, with or without reasonable accommodation (which be must describe); and (3) the employer terminated him because of his disability. *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1443 (10th Cir. 1996).

For the purposes of summary judgment, the trial court assumed proof of the first element of a prima facie case: that plaintiff was an individual with a disability. [FN2] The court focused on the second element and determined that, based on plaintiff's undisputed record of absenteeism, he was not a qualified individual entitled to the protection of the ADA. See *Tyndall v. National Educ. Ctrs. Inc.*, 31 F.3d 209, 213 (4th Cir.1994) ("[A] regular and reliable level of attendance is a necessary element of most jobs."); cf. *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994) (Under the Rehabilitation Act of 1973, "an ability to appear for work" is an essential function of any government job).

FN 2. The ADA defines disability, in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).

We agree with the trial court that plaintiff's frequent, unauthorized, and prolonged absences meant that he was unable to perform the essential functions of the job of light vehicle driver. Consequently, plaintiff could not demonstrate that he was a qualified individual entitled to the protection of the ADA. See *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1168–69 (10th Cir.1996) (holding an employee who required indefinite unpaid leave to recover from a work-related injury was not a qualified individual who could perform her job with reasonable accommodation). [FN 3] Because plaintiff failed to prove the second element of a prima facie case, summary judgment was the appropriate disposition of the ADA claim. [FN 4]

FN 3. Our determination that plaintiff is not a qualified individual under the ADA is not dependent upon whether or not his absences were attributable to on-the-job stress. Accordingly, we do not address plaintiff's arguments concerning the application of a "reasonable mentally handicapped person" standard or the import of expert witness testimony on the reasons for his absences.

FN 4. Because plaintiff failed to prove the second element of a prima facie case, we do not decide if he satisfied the third element: whether SIF's actions amounted to constructive discharge and were attributable to plaintiff's disability.

For essentially the same reasons set forth in our analysis of the ADA claim, plaintiff's state statutory claims also fail. The Oklahoma Antidiscrimination Act prohibits discrimination against an individual because of his handicap unless the action is related to a "bona fide occupational qualification reasonably necessary to the normal operation of the employer's business." Okla.Stat. tit. 25, § 1302(A)(1). Here, ordering plaintiff to attend work in a regular and reliable manner amounted to a bona fide occupational requirement necessary to the functioning of SIF's operations. [FN 5]

FN 5. The trial court dismissed plaintiff's state statutory claims on the ground that the applicable statutes do not require "reasonable accommodation." Because we hold that plaintiff's evidence was insufficient to establish unlawful discrimination, we have no occasion to address this issue of statutory construction.

Plaintiff's statutory claim under the Oklahoma Personnel Act is also unsuccessful. The measure relating to state employment of the handicapped, Okla. Stat. tit. 74, § 840–4.12(H), exempts persons with severe disabilities from merit system entrance examinations and hiring procedures if they meet the minimum ·qualifications in the applicable job specifications. Plaintiff provided no evidence that SIF violated § 840–4.12(H).

The final contention on appeal is that plaintiff was constructively discharged in violation of Oklahoma public policy against discrimination on the basis of disability. In *Burk v. K–Mart Corp.*, 770 P.2d 24, 28 (Okla. 1989), the Oklahoma Supreme Court adopted an "exception to the at-will termination rule in a narrow class of cases in which the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law." As explained above, plaintiff did not demonstrate that SIF"s actions were in violation of the public policy expressed in either federal or state law. [FN 6]

> FN 6. The trial court determined that plaintiff's claim was a status-based claim with an adequate statutory remedy and, therefore, precluded by the holding of the Oklahoma Supreme Court in *List v. Anchor Paint Mfg. Co.*, 910 P.2d 1011, 1015 (Okla.1996). We do not reach this issue.

\*\*3 The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED.

END OF DOCUMENT